# FEDERAL DEFENDER SERVICES OF WISCONSIN, INC.

LEGAL COUNSEL

Craig W. Albee, Federal Defender
Krista A. Halla-Valdes, First Assistant
Joseph A. Bugni, Madison Supervisor
John W. Campion
Shelley M. Fite
Anderson M. Gansner
Gabriela A. Leija
Peter R. Moyers
Ronnie V. Murray
Tom E. Phillip
Joshua D. Uller
Kelly A. Welsh

517 E. Wisconsin Avenue
Room 182
Milwaukee, Wisconsin 53202

Telephone 414-221-9900
Facsimile 414-221-9901


February 5, 2019

Honorable Pamela Pepper
United States District Court
Eastern District of Wisconsin
517 E. Wisconsin Avenue
Milwaukee, WI 53202

RE: *United States v. Chad Grubbs*
Case Nos. 18-cr-176 (PP)

Dear Judge Pepper:

Chad Grubbs is a strange man, one with a history of bizarre acts, mental illness, and serious substance abuse. And in this case, he did a callous, selfish, and frightening thing. He wrote three letters to the Jewish Community Center in Whitefish Bay, promising to wreak unspeakable violence. But as we know, he had no ability to carry out these threats. At the time, he was incarcerated 100 miles away. And oddly, he didn't seem to care whether the JCC received his letters. He used the wrong address, city, and zip code, so the first two letters were returned to sender, and the last was intercepted by jail staff. Even more odd, he made no attempt to evade responsibility. He put his full name on each letter, told the reader where he was incarcerated, and put down his full and correct return address.

So Mr. Grubbs sent the letters hoping that they would be discovered and reported to law enforcement, and that his then-upcoming term of state supervision would be revoked. Along with another threatening letter he wrote to a state court judge, this scheme worked all too well. Instead of just being revoked, he was prosecuted both in state court and here, receiving a prison sentence three-times longer than he anticipated

But why would a person seeking to avoid supervision—a foolish, but at least understandable goal— act like this? After all, you can violate your supervision in all sorts of ways. The answer lies deep in the presentence report, with Mr. Grubbs' diagnosis by the clinicians at the Mendota Mental Health Institute. Those doctors believed that Mr. Grubbs had some form of schizophrenia, perhaps the most terrible of all common mental disorders. *See* Presentence Report at ¶103.

And as the facts show, his behavior lines up with the symptoms of schizophrenia—fear of persecution, paranoia, lack of concern for others, and a flat affect. *See* Dina Cagliostro, *Schizophrenia Symptoms & Diagnosis*, Psycom[1]; *see, e.g.*, PSR at ¶104 (noting symptoms of paranoia). So this Court is faced with a hard task—figuring out the right sentence for a frightening, cruel offense committed by a mentally ill person.

In light of Mr. Grubbs' offense, his history and family support, and the realities of prison, the defense contends that a concurrent sentence of 37 months is enough to meet the goals of sentencing and do justice in this case.

**Background**

*Mr. Grubbs' Personal Background*

Many details of Mr. Grubbs' life are difficult to establish. And that's understandable. When a person suffers from mental health problems and has abused drugs and alcohol as much as Mr. Grubbs has, that person tends to not

[1] Available at https://www.psycom.net/schizophrenia-symptoms-diagnosis.

have the most accurate memory. So what we can say definitively about Mr. Grubbs comes from records and the recollections of others.

We know that he grew up in Southern California, with two married parents, in a middle-class neighborhood. *See* PSR at ¶83. As an example of that "normal" existence, his father coached him in little league. *See* Ex. A, Letter from Steve Grubbs. But Mr. Grubbs' life became less stable at a crucial time, with his parents divorcing when he was 13, right at the start of adolescence, and right as he was diagnosed with ADD. *See* PSR at ¶¶82, 85, 89; Ex. B, Letter from Wendy Grubbs at 1. His mother moved to Washington state, and he came with her. PSR at ¶82.

That move didn't go well. In a new environment, likely one with less supervision, Mr. Grubbs got arrested three times in 15-month period. *See* PSR at ¶¶42-44. He also reports that he started to use alcohol, marijuana, and methamphetamine. *Id.* at ¶¶108, 109, 112. According to Mr. Grubbs, that use soon grew into abuse. He claims to have typically consumed six-to-twelve drinks every day (making him a full-fledged alcoholic), to have smoked marijuana daily from age 14 until his early 20s, and, from high school on, to have snorted methamphetamine whenever he could get it. PSR at ¶¶109, 112.

Of course, we can't verify those details, but we do know that Mr. Grubbs was arrested repeatedly for substance-related offenses. For instance, he has been arrested many times either for public intoxication or for incidents occurring when he was drunk. *See* PSR at ¶¶43, 46, 52-54, 58-59, 68-69, 71. Police found him with marijuana at least once. *Id.* at ¶51. And bizarrely, two-and-a-half years ago, Mr. Grubbs was speaking with a police officer and, unprompted, pulled out a baggie of meth to show to the officer. *Id.* at ¶60.

Mr. Grubbs' family have seen him struggle with addiction, *see* Ex. A at 2, and tried to get him help. He reports going to five different inpatient treatment centers, the first when he was just 15 years old. PSR at ¶113. The probation office retrieved records from two centers—which would be Mr. Grubbs' most recent stays. *See id.* at ¶¶114-115. These records confirm that he spent 90 days at a Washington state treatment center in 2008, and completed a 20-day detox program in 2013 at a facility in California. *Id.*

Turning back to his adolescence, after his multiple arrests, Mr. Grubbs returned to California to live with his father and finish out high school. (Mr. Grubbs' father recalls his son playing high school football during that time and receiving a team award. *See* Ex. A at 1.) He went to high school in California for about seven months, and then was referred to an adult education program, where he apparently earned a GED. *See* PSR at ¶117. Mr. Grubbs then enrolled at Cuesta College in San Luis Obispo (SLO), just 15 miles up the road. He went to Cuesta for two years, earning a "C" average in his courses. *Id.* at ¶118.

Mr. Grubbs reports transferring to Cal Poly SLO, the premier public university in that part of the state, but the probation office couldn't verify this claim and his father didn't recall him enrolling there. *Id.* at ¶119. Records show that he was arrested in SLO for obstructing an officer about two months after he stopped school at Cuesta. PSR at ¶45. His father had just moved back to San Diego, a five-hour drive away, and gotten remarried. *See* Ex. B. His stepmother, Wendy, recalls Mr. Grubbs enrolling in culinary school in Oregon, and traveling up to Oregon with Mr. Grubbs and his father to get him settled. *Id.* at 2. But she also remembers that he was struggling emotionally. *See id.* at 1-2. And Mr. Grubbs had no support network in Oregon, with his mother in Washington state and his father in California.

So it seems unsurprising that culinary school flopped. Later that year, Mr. Grubbs moved to Alaska for some period of time, then ended up back in Washington state. He claims to have worked at various jobs, although very little has been verified. Based on his arrest record, we can tell that he was back in the Puget Sound area, where his mother lives. His arrests pile up from there over the next several years—an OWI, a bizarre theft case where he took an ex-girlfriend's car keys and left her car in the middle of a bridge, possessing drugs, driving without a license, drinking in public, and trespassing. PSR at ¶¶46-55. We also know from medical records, that he spent 90 days at an inpatient treatment center during these years. And these years, a person's early 20s, are often when mental illness emerges.

Mr. Grubbs then moved back in Oregon, where he committed his first "threats" offense, this time sending ominous text messages, which earned him a

misdemeanor conviction. *Id.* at ¶ 56. Mr. Grubbs recalls living in Portland for some period of time, and he did pick up a misdemeanor conviction there. *See id.* at ¶57. He also claims to have fathered a child in Portland, but the probation office couldn't find any child support order. *See* PSR at ¶93.

Whether during, before, or after his time in Portland, Mr. Grubbs became aware of different white supremacist groups. One group, in particular, caught his attention—an organization with the bizarre name of the "Insane Peckerwood Syndicate" (IPS). *See* PSR at ¶96. This is a real organization. And they do operate in the Pacific Northwest. *See* Southern Poverty Law Center, *Massive Investigation Uncovers White Supremacist Criminal Network in Oregon* (June 3, 2014)[2]; *see also* Bryan Denson, *Eugene member of Insane Peckerwood Syndicate gang sentenced to prison*, The Oregonian (Mar. 11, 2015).[3] But we don't know whether Mr. Grubbs had any actual involvement with this group and, if so, what that involvement was.

Also one suspects that Mr. Grubbs did not join any "prison" gang during his time on the West Coast, because he was never jailed for very long. His longest period of incarceration in Washington, California, or Oregon appears to have been 50 days, which he would have likely served in a local jail, not a state prison. *See* PSR at ¶47 (noting two revocation modifications of 50 days). In any event, Mr. Grubbs does have different white supremacist tattoos, and prior to this case had harassed minorities and bragged about his alleged ties to white supremacists. But for the past several years, he also seems to have been suffering from some sort of paranoia with regard to IPS. He is not bragging about being a member or claiming to represent that gang. Rather, he is deathly afraid of them.

This fear has been documented repeatedly throughout the past several years. For instance, Mr. Grubbs' father was interviewed by the FBI as part of this investigation, and he noted his son's paranoid statements about IPS. *See* Ex. C, FBI Report of Interview with Steven Grubbs, at 1-2. Even Mr. Grubbs' mother appeared to play along with his paranoia, in responding to a letter from him.

---

[2] Available at https://www.splcenter.org/hatewatch/2014/06/03/massive-investigation-uncovers-white-supremacist-criminal-network-oregon.
[3] Available at https://www.oregonlive.com/pacific-northwest-news/index.ssf/2015/03/eugene_member_of_insane_pecker.html.

*See* Ex. D, Discovery Excerpts Containing Letter from Karen Nelson. This paranoia, whether real or imagined, seems to have led Mr. Grubbs to Wisconsin from the West Coast. And this paranoia seems to underlie some of Mr. Grubbs' various self-destructive actions, including the offense in this case.

Another dominating aspect of Mr. Grubbs' life has been his apparent substance abuse. From records, arrest reports, and family statements, he appears to have abused drugs and alcohol throughout his life. And he seems to be a rude and belligerent drunk. The PSR contains numerous examples of him being drunk and accosting other people, sometimes getting into drunken brawls. But notably, in his worst and most harshly punished offenses, Mr. Grubbs did not physically harm anyone. For instance, in his Dane County battery case he never touched the victim. *See* PSR at ¶59. Rather, his companion did, while Mr. Grubbs stood nearby. But for egging his friend on (telling him to take the victim's phone), Mr. Grubbs was convicted as a party to a crime. *Id.* And in his stalking-by-text case, Mr. Grubbs sent inexplicable and disturbing texts, but never followed up on them. PSR at ¶61.

Between these two offenses, Mr. Grubbs had several arrests, including a bizarre interaction with a Madison police officer. In that encounter, Mr. Grubbs made delusional statements, claiming that he was being followed by different vehicles, that skinheads were looking for him, and that there had been "silent gunshots" near him. He then took out drugs from his pocket to show the officer, telling the officer that he wanted to be arrested and that if the officer didn't arrest him, he would have to commit a new felony. PSR at ¶60. (This behavior is quite similar to what his father described to the FBI. *See* Ex. C.)

After this arrest, Mr. Grubbs was taken to the Mendota Mental Health Institute, where he was psychologically evaluated. Doctors found him competent to stand trial, but also diagnosed him with "Unspecified Schizophrenia Spectrum and Other Psychotic Disorder." PSR at ¶103. Another doctor at Mendota noted that Mr. Grubbs had a "delusional system" and displayed "symptoms of paranoia toward another peer." *Id.* at ¶104. He was placed on medication to treat schizophrenia.

Dane County Sheriff reports show Mr. Grubbs behaving in similar paranoid ways at other times too. For instance, when Mr. Grubbs was jailed as part of his Dane County battery offense, he told jail officials that "there is a hit out on his life by a West Coast White Supremacist gang," specifically IPS. Mr. Grubbs told deputies that he "believed he would be shot and killed following his release." Ex. E, Excerpt from Dane County Sheriff Reports at 1-2. Deputies also listened to phone calls between Mr. Grubbs and his father, where Mr. Grubbs related his fear of being back in society, and how he thought Madison was too small a town for him to hide in. *See id.* at 3.

*The Offense Conduct*

Mr. Grubbs appears to have been in a similar frame of mind at the time of the instant offense. As his stalking sentence neared its end in the Spring of 2018, he began to act out, with the apparent goal of staying in prison, or at least terminating his state supervision.

Specifically, Mr. Grubbs got into a fight 10 months earlier, but his supervision term was not pre-emptively revoked. In February 2018 he was sentenced to 60 days in jail for that offense, consecutive to his expiring prison sentence. But due to some paperwork snafu, Mr. Grubbs was released in April 2018, before serving that jail sentence. He immediately went to his assigned probation office in Racine, refused to cooperate with his terms of supervision, and demanded to be returned to jail. *See* PSR at ¶61, p. 29. Authorities ultimately arrested him, resolved the mix-up, and he was taken to the Winnebago County Jail to serve his 60-day sentence.

But he still wanted to be revoked. Back in jail, he apparently wrote to his mother about feeling unsafe on the street and how he thought a gang was out to get him. *See* Ex. D. Writing back, his mother suggested a plan of action: "I do think that if there are any goons out there, why not stay in jail where it is safer?" *Id.* at 2. Little did she know, Mr. Grubbs already had the same idea.

Over a series nine days, Mr. Grubbs wrote three letters to the Jewish Community Center in Whitefish Bay. Each letter laid out a plan to come to the JCC and attack the facility, using guns or, in one letter, a dirty bomb. The letters contain explicit,

florid language, with Mr. Grubbs claiming to be a "violent White Supremacist" and "a modern day Viking." He also signed the letters with his first and last name. In his first letter, he accurately noted that he was serving a jail sentence for battery. And he put down the correct return address for the Winnebago County Jail on each envelope. But he did not use the right mailing address for the JCC. Instead he wrote the wrong street number, city, and zip code. *See* Doc. 24, PSR Addendum, at 2-4. So none of these letters were delivered to the JCC. *See id.* at 2.

They were noticed only when the Postal Service returned the first two to sender, and jail staff at Winnebago County intercepted them. *See* Ex. D at 1. Jail staff then intercepted the third letter before it reached the Postal Service. But since mail takes some time to be returned, more than two weeks passed between Mr. Grubbs mailing the first letter and when he learned that law enforcement had found them. Specifically, he wrote the first letter on May 7, and didn't learn that police had found the letters any sooner than May 22. This may explain the multiple letters: Mr. Grubbs didn't get the reaction he wanted. So he kept writing.

That time lag also seems to explain his other, related offense. Right before Mr. Grubbs wrote the third letter to the JCC, he wrote to the Winnebago County judge who had presided over his battery case. Just like the letters to the JCC, this letter threatened the judge in clear, direct language and was signed by Mr. Grubbs. Unlike the letters to the JCC though, this letter was properly addressed and delivered. Law enforcement became aware of these different letters at roughly the same time. Mr. Grubbs was promptly charged in state court, on May 22nd, for the letter to the judge. *See* PSR at ¶63. A federal investigation began as well. Counsel was appointed as a pre-charging matter, and Mr. Grubbs was later indicted.

There has never been any question about Mr. Grubbs' guilt. So the parties negotiated a plea agreement, and after Mr. Grubbs read the reports relating the FBI's interviews with JCC employees, he signed an affidavit making clear that he took no steps to carry out his threats, and was not working with anyone "on the outside." *See* Ex. F, Affidavit of Chad Grubbs. Later, with the assistance of counsel, he wrote a letter to the JCC apologizing and calling out his actions as "hateful, ignorant, and inexcusable." *See* Ex. G, Letter from Chad Grubbs. The defense

provided that apology letter to the government weeks ago, in the hope that it might be passed along to the JCC.

What's happened since his federal indictment falls into the "be careful what you wish for" category. Mr. Grubbs' state prison sentence was revoked, for two years. *See* PSR at ¶61. Pleading guilty in his Winnebago County case, he was sentenced and received a four-year consecutive prison sentence, with two additional years of state supervision. *Id.* at ¶63. This was a longer prison term than what the state recommended. And, of course, more state supervision was apparently what Mr. Grubbs was most trying to avoid. (From counsel's understanding, Mr. Grubbs may believe that serving a term of supervision makes him a "sitting duck" for the IPS members who are out to get him.)

Mr. Grubbs' actions since April of 2018 thus represent a foolish, callous comedy of errors. In an effort to get himself revoked, he got more than what he bargained for, and left a trail of confused and frightened people in his wake. He will be in state prison until at least May 2024. As far as his sentencing here, the parties agree that the applicable guideline range is 37 to 46 months. The government has stated that it intends to ask for a consecutive sentence within that range. Doc. 24 at 1.

**Argument**

A typical person might write a threatening letter because they want to scare the recipient. Maybe they're angry at the recipient, or they're just a jerk and want to amuse themselves. But a typical person also would want to avoid responsibility. No rational person wants to be punished. In fact, the desire to avoid punishment is a core concept underlying our criminal justice system.

But Mr. Grubbs' intent was clearly different. He wanted to be caught. That's why he signed his full name, mentioned the jail that he was at and the prison where he had been before, and included a full return address. This made it easy for anyone who got the letters to know who sent them. And he was clearly looking for some consequences, which is why he wrote three different letters (since the first two brought no reaction, at least at first) and then mixed in a fourth letter to a state court judge—which was also signed, with a proper return address.

*Mr. Grubbs is mentally ill, is not receiving treatment, and is unlikely to receive treatment in the Bureau of Prisons.*

That begs the question: why exactly did Mr. Grubbs write these letters? And why would he identify himself? Clearly he wanted to get caught. And he's stated that he did it because he wanted to be revoked. He wanted to stay in prison, or at the very least not serve a term of supervision in Wisconsin. But why did he want that? Based on statements he's made to his family, he committed these acts because he's mentally ill, stricken with paranoia.

At times in the past, he has told the people closest to him that White Supremacist gang members are out to get him. That he's afraid for his life, that people are following him, and planning to kill him. And maybe they are. Stranger things have happened. But more likely, these fears are a symptom of the untreated schizophrenia he was diagnosed with in 2016.

Delusions of persecution are a primary positive symptom of schizophrenia. *See* Cagliostro, *supra*. His other actions and behavior seem consistent with schizophrenia too. Mr. Grubbs' avolition in the outside world—his inability to take goal-oriented actions—has been shown throughout his adult life. *Id.* His apathy toward others was displayed by the remarkably little care he had for the recipients of his letters. And from interacting with Mr. Grubbs many times, he has a flat affect—a blank look and an oddly steady voice—and is remarkably evenly keeled under the circumstances. *Id.* Unfortunately, despite these documented symptoms and despite his diagnosis by experts at Mendota, Mr. Grubbs is not receiving any mental health treatment. He's not undergoing any counseling, and not even receiving any medication.

Currently, he is incarcerated at the Green Bay Correctional Institution, a high security state prison. The rehabilitative options there are limited. Mr. Grubbs has a part-time job in the kitchen, earning pennies per hour. He's on waiting lists for programs, like anger management classes. But since he has a federal detainer, he's unlikely to get into any substantive programs. And given his past behavior in

prison, he is likely to stay at a high security facility for the rest of his time in state custody, especially if the federal detainer stays in place.

So the fact that he is not receiving mental health treatment is predictable. Indeed, it's par for the course. Most prison systems are overwhelmed by mentally ill inmates, including the federal system *See, e.g.*, Darrell Steinberg, David Mills, & Michael Romano, *When did prisons become acceptable mental healthcare facilities?* Stanford Law School Three Strikes Project at 3 (May 2017) (noting that 45% of all prison inmates in California are mentally ill)[4]; U.S. Dep't of Justice, Office of Justice Programs, NJC 213600, *Bureau of Justice Statistics Special Report: Mental Health Problems of Prison and Jail Inmates*, at 4 (tbl. 3) (Sept. 2006) (estimating that 45% of federal inmates have a mental illness).[5]

So should Mr. Grubbs receive a consecutive sentence, the odds of him receiving mental health treatment in the BOP are minimal. Indeed, recent reports suggest that the BOP is doing a significantly *worse* job of treating mentally ill inmates than other prison systems. *See* Christie Thompson & Taylor Eldridge, *'No One to Talk You Down' Inside federal prisons' dangerous failure to treat inmates with mental-health disorders*, The Wash. Post (Nov. 21, 2018) ("As of February [2018], the Bureau of Prisons classified just 3 percent of inmates as having a mental illness serious enough to require regular treatment. By comparison, more than 30 percent of those incarcerated in California state prisons receive care for a 'serious mental disorder' In New York, 21 percent of inmates are on the mental-health caseload. Texas prisons provide treatment for roughly 20 percent.").[6]

Here's why. The BOP implemented a new policy in 2014 that was supposed to improve care for mentally ill inmates. *See id*. Yet what the BOP has done since is simply play with its classification system. It now labels far fewer inmates with "serious" mental illnesses, because such inmates are required to get regular mental

---

4 Available at https://law.stanford.edu/publications/when-did-prisons-become-acceptable-mental-healthcare-facilities-2/.

5 Available at https://www.bjs.gov/content/pub/pdf/mhppji.pdf. This appears to be the most recent study done by the DOJ on the mental health status of federal inmates.

6 Available at https://www.washingtonpost.com/news/national/wp/2018/11/21/feature/federal-prisons-were-told-to-improve-inmates-access-to-mental-health-care-theyve-failed-miserably/?noredirect=on&utm_term=.924bc7f7ad85;

health treatment. *See id*. Specifically, the BOP lacks the funds to implement these new policies, and thus has "an incentive for employees to downgrade" inmates by claiming that they aren't really *that* mentally ill. *Id.* Hiring freezes and difficulty in attracting qualified professionals haven't helped either. *See id.* The end result is that many inmates "some with long histories of psychiatric problems" aren't getting any regular care. *See id.* With regard to Mr. Grubbs, this means that he is unlikely to receive regular mental health care while in the BOP, and that his mental health issues will remain untreated until his release. *See, e.g.*, Erica Zunkel, *18 U.S.C. § 3553(a)'s Undervalued Sentencing Command: Providing a Federal Criminal Defendant with Rehabilitation, Training, and Treatment in "the Most Effective Manner"*, 9 Notre Dame Journal of International & Comparative Law, Article 5, at 57 (2019) ("It has become clear that the BOP is not equipped to provide inmates with some of the most basic treatment and rehabilitative services, including effective medical care and mental health care.").[7]

This is terrible news for a number of reasons. First, it means that Mr. Grubbs will likely suffer from a serious, untreated mental illness for years to come. But it also means that the community will not be protected from Mr. Grubbs committing similar crimes. After all, he committed the letters at issue while in jail, as part of a paranoid delusion that gang members were trying to hunt him down. He'll also have the ability to write letters at some point going forward. So the only way to truly protect the community from similar crimes is to ensure that Mr. Grubbs gets mental health treatment, and addressing the symptoms of paranoia, apathy, and delusions of persecution. Getting that treatment is at odds with a sentence of incarceration. Rather, the best chance for Mr. Grubbs to get the treatment he needs, and to protect the community from further threats, is to have him return to the community, where he can actually get mental health treatment with the help of caring people like his father and stepmother.

[7] Available at: https://scholarship.law.nd.edu/ndjicl/vol9/iss1/5.

*Because of his paranoia-influenced intent, Mr. Grubbs is less culpable than similar offenders.*

The guideline range in this case is 37 to 46 months. Under §2A6.1 and §3A1.1, the offense level depends on the number of threats and the target of those threats. So many individuals who write threatening letters might have a similar offense level, and perhaps a similar guideline range. But Mr. Grubbs would seem to stand apart. He wanted to be caught. So he put down his full name and correct return address. This would seem to make him less culpable, at least comparatively.

Compare him to an anonymous letter writer, or someone who calls in a bomb threat from a pay phone. Those people make threats *purely* to amuse themselves, to delight in the fear of others. And yes, the same reason may have motivated Mr. Grubbs, at least in part. But that wasn't his whole, or perhaps even his main, reason for doing what he did. Instead, he was motivated by a desire to be caught and revoked. That desire, in turn, appears to stem from a long-standing, untreated mental illness. So that makes his case different.

*The JCC never received the letters because of Mr. Grubbs' negligence and indifference.*

Also different is the haphazard manner of the communications. Specifically, Mr. Grubbs couldn't be bothered to find or use the right address for the JCC, and instead gave an almost completely incorrect address. This negligence suggests that he didn't care much whether the JCC actually received the letters. And that again makes him different from other individuals who have sent similar letters.

Because you would expect that a person who wants to threaten someone else would make sure that the threat was received. Why bother to send a threat otherwise? Most people know that threats of violence are illegal. So any rational person who wanted to threaten someone else would want to make sure that the threat got through, to justify the risk. But not Mr. Grubbs. He apparently didn't care whether the letters made it there or not. His main goal was to get revoked. As a result, he just wanted someone to get the letters. It could be someone at the wrong address, or a jail staffer. Anyone would do, so long as they called the police.

Again, this separates Mr. Grubbs. It doesn't excuse his conduct, but it distinguishes him from someone who is actually committed to delivering a threat. Such a person is deserving of more punishment than someone who doesn't really care, who was just looking to get caught. But under the guidelines, the suggested range of punishment would be the same.

Finally, Mr. Grubbs' apathy and negligence reduced the impact on the victim, at least one would hope. Learning of the letters from law enforcement may have made the experience less frightening for the JCC and its employees. They did not open a letter, and read the threats firsthand. Rather, they learned of the threats from the FBI, and thus knew that law enforcement had already intervened and that Mr. Grubbs was in jail.

*No evidence suggests that Mr. Grubbs took any steps to carry out his threats, and he has no history of gun possession or gun violence.*

Mr. Grubbs' letters to the JCC referenced a plan to use explosives and firearms to harm people. Thankfully, he has no record of possessing firearms or explosives. He may not even know how to use a gun. Mr. Grubbs has no experience in the military or in law enforcement, and no history of hunting. In short, he has never used a firearm to commit a crime, and as a felon is barred from possessing or buying a firearm. As far as actual violence, the most he has done is pick fistfights, usually when drunk.

In addition, authorities have found no evidence that Mr. Grubbs intended to carry out any of his threats. For instance, when he was briefly released in April 2018, just a few weeks before writing the letters, he didn't commit any hate crimes, harass any minority groups, or get anywhere near the JCC. Instead, all he did was try to get revoked. He went to his probation office in Racine and refused to comply with his conditions. *See* PSR at ¶61, p. 29. Also, at the time he made the threats, he was incarcerated and so couldn't carry them out. In fact, the act of writing the letters (and giving his name and return address) actually prevented him from carrying out the threats they contained—the letters ensured that he would be investigated, prosecuted, and kept in prison. Law enforcement also have found no evidence that Mr. Grubbs conspired with anyone outside of jail or prison to carry out any attack,

acquire weapons, or to surveil the JCC. He signed an affidavit attesting that his claim about having a co-conspirator was a lie.

So while Mr. Grubbs letters were despicable, and his White Supremacist affiliations are repugnant, he seems to be all hat and no cattle. He has often talked a big game, but rarely backed it up. *See* PSR at ¶90.

*Mr. Grubbs has a long history of substance abuse, and is unlikely to receive treatment while in prison.*

Based on records of inpatient treatment, his criminal history, and his and his family's own reporting, Mr. Grubbs has abused drugs and alcohol for nearly two decades. Alcohol has been linked to most of his arrests and convictions. Without those offenses, he would have a drastically shorter criminal history. So he appears to be a true alcoholic—someone compelled to drink every day. And he appears to be a violent or at least impulsive drunk. When he gets drunk, he acts foolishly or aggressively.

But other substances also seem to have negatively affected him. He reports that he smoked marijuana nearly every day from age 14 into his early 20s. That is the exact wrong time in a person's life to be using large amounts of marijuana. A teenager's brain is still growing and maturing, and marijuana use by teens can both stunt brain development and increase the risk of mental illness as an adult. Kirsten Weir, *Marijuana and the Developing Brain*, Am. Psych. Assoc. (Nov. 2015) (repeated exposure to marijuana "can dial down cellular activity" in the parts of the brain crucial to cognition and stress response)[8]; Am. Psych. Assoc., *Regular Marijuana Use Bad for Teens' Brains* (Aug. 9, 2014) ("People who have become addicted to marijuana can lose an average of six IQ points by adulthood.")[9]; *see id.* ("research has shown that frequent use of high potency THC can increase risk of acute and future problems with depression, anxiety, and psychosis").

Mr. Grubbs also reports that he was addicted to methamphetamines. This is an especially toxic and addictive drug. Methamphetamine produces a "high" by

---

[8] Available at https://www.apa.org/monitor/2015/11/marijuana-brain.
[9] Available at https://www.apa.org/news/press/releases/2014/08/regular-marijuana.

blocking dopamine from leaving brain cells, thus increasing dopamine activity in the brain. But meth also overloads the brain's reward system. Basically, meth alters a person's brain chemistry so that the regular ways that a person experiences pleasure—through a shared joke or a delicious dessert, for example—do nothing anymore. *See* John Albert, *Bad News for Meth Addicts- How Meth Can Permanently Rob Your Brain of Pleasure*, The Fix (Apr. 12, 2011).[10] Meth users can only experience pleasure while on meth, or through extreme risk-taking or sensation-seeking behavior. *See* William A. Zule *et al*. *Methamphetamine Sue and Risky Sexual Behaviors*, 34 Sexually Transmitted Diseases 689 (2007). So, no surprise, various studies of meth users found that the drug increased their risk for violent behavior. *See, e.g.,* Ira Sommers & Deborah Baskin, *Methamphetamine Use and Violence*, 6 Journal of Drug Issues 77 (2006). Increased anxiety, confusion, paranoia, and insomnia are also associated with methamphetamine use, *see id.* at 79, as are memory and learning impairments, Paul M. Thompson *et al*., *Structural Abnormalities in the Brains of Human Subjects Who Use Methamphetamine*, 24 The Journal of Neuroscience 6028, 6031-32 (June 2004).

This may explain why Mr. Grubbs issued threats when seeking to revoke himself, rather than just refusing to comply with his release conditions. Deprived of meth, he may have been trying to find a "rush" from extreme risk-taking. But meth abuse has long-term physical effects, changing the structure of a person's brain. *See* Thompson, *supra*. And meth abuse and mental disorders often go hand in hand. *See* Timothy W. Lineberry & J. Michael Bostwick, *Methamphetamine Abuse: A Perfect Storm of Complications*, 81 Mayo Clinic Proceedings 77, 82-83 (Jan. 2006) ("It is the rule rather than the exception that psychiatric disorders accompany methamphetamine abuse . . . . Ongoing methamphetamine abuse atop a preexisting psychiatric disorder alters the natural history of the disorder and increases treatment resistance."). So a clinician would not be surprised to learn that Mr. Grubbs has abused meth while also struggling with schizophrenia-type psychosis. Nor would a specialist be surprised that typical drug treatment programs that don't account for meth's pernicious effects were unsuccessful.

---

[10] Available at https://www.thefix.com/content/going-sad.

Looking to his treatment options, again his odds of receiving high quality, specialized treatment while incarcerated are poor. Because of his federal detainer, he is unlikely to get such treatment in the Wisconsin DOC. Once in the BOP, the waiting list for RDAP is always long, and its eligibility rules are strict. Not every facility has that program. And with Mr. Grubbs' record, he will likely be incarcerated at a USP, which will be less likely to have RDAP.

In sum, Mr. Grubbs needs serious dual-diagnosis treatment from experienced clinicians. Given his criminal history and his actions in this case, such treatment is best option for protecting the community and reducing the risk of recidivism. But Mr. Grubbs is highly unlikely to receive such treatment in prison.

*Mr. Grubbs has stable, mature family members who are willing to help him.*

Most federal criminal defendants don't have educated, professional, supportive family members. And that certainly goes for most defendants in Criminal History Category VI. But Mr. Grubbs is lucky. His father and stepmother still care. *See* Ex. A, Ex. B. They haven't written him off. And they have made clear that they are willing to help him upon his release. *See* PSR at ¶94; Ex. H, Email from Wendy Grubbs (noting Steve Grubbs' "unconditional" commitment to helping his son). Working with the probation office, they should be able to guide him into an appropriate treatment program and give him moral and financial support. Of course, we can't know whether that treatment will take, whether Mr. Grubbs will get better and be able to live a normal life. But we can know that because of his family support, he has a much better shot than most defendants.

*The 3553(a) factors are satisfied by a concurrent sentence, given how they will worsen his conditions of confinement.*

At the end of the sentencing process, the Court has to apply the § 3553(a) factors. The government will certainly cite to those factors in making its sentencing request, pointing to the seriousness of the offense, and the need to deter others and promote respect for the law. All of those factors do call for a meaningful sentence. Mr. Grubbs sent three frightening and cruel letters, at least partly out of religious and racial animus. That's a real crime, and he deserves punishment. But the Court

can't limit its consideration to just those factors. It has to look at the whole picture, why and how the offense occurred, Mr. Grubbs' tortured history, and how best to protect the community, personally deter Mr. Grubbs, and to rehabilitate him. Given the realities of prison, the best option to address all of these factors is a concurrent prison sentence, followed by supervision.

As the Court knows, a federal detainer, created by a concurrent sentence, has a real impact. It will keep Mr. Grubbs at a higher security facility. Such facilities are less rehabilitative, and more about keeping inmates under control. So he will have less programming options, and be surrounded by more dangerous inmates. And for any helpful programming that's available, he'll be placed at the back of the line.

This means that for the length of any concurrent sentence, Mr. Grubbs will be unlikely to receive substance abuse treatment, or cognitive behavioral therapy, or anger management treatment. He is already not receiving mental health treatment, and there's no apparent reason why that should change going forward, unless he has a complete breakdown. (Simply continuing to suffer from delusions of persecution doesn't seem to be enough.) So a concurrent sentence will have a real, punitive effect. Mr. Grubbs will not be "getting off" or doing the time for free. He will be in worse, tougher conditions because of his federal sentence and will know that every day. That helps satisfy the more punitive § 3553(a) factors.

The Court could then follow this concurrent sentence with a term of supervision, requiring mental health treatment and substance abuse treatment. Supervision also would be punitive for Mr. Grubbs. He has shown that he does not want to serve a term of supervision, and would regard it, at least in his current mental state, as a true penalty. But it also seems to be our best hope for him.

After all, Mr. Grubbs is 33 years old. He's not even halfway through a regular lifespan. And he isn't stupid. He can write and think clearly at times. But he does appear to be sick, ravaged by substance abuse and paranoia. And he has made horrid choices throughout his life. So this sentence could be one of two things. It could be a turning point, setting the table for Mr. Grubbs to change for the better. Or it could continue the status quo—keeping him incarcerated, as he wishes, while his dire need for treatment goes unmet.

The defense requests a sentence that is punitive, that will make Mr. Grubbs uncomfortable, that he'll know he is serving. But it also requests a sentence that gives Mr. Grubbs the best chance to change, to rehabilitate himself, and to protect the community in the long run. That sentence is a concurrent term of imprisonment, followed by a term of supervision with stringent and specific conditions.

Thank you for your attention to this matter.

Respectfully submitted,

/s/ ***Anderson M. Gansner***

AMG/cm

Enclosures